AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)   ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

LODGED
CLERK, U.S. DISTRICT COURT
1/29/24
CENTRAL DISTRICT OF CALIFORNIA
BY: eb   DEPUTY

FILED
CLERK, U.S. DISTRICT COURT
01/29/2024
CENTRAL DISTRICT OF CALIFORNIA
BY: M.B.   DEPUTY

United States of America

v.

MARIO AYALA-OCAMPO,

Defendant.

Case No. 8:24-mj-00040-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of April 13, 2020, in the County of Orange in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii) | Distribution of At Least 50 Grams of Methamphetamine, a Schedule II Controlled Substance |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/
Complainant's signature

Steven N. Levin, DEA, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: January 29, 2024

*Judge's signature*

City and state: Santa Ana, California

Hon. John D. Early, U.S. Magistrate Judge
*Printed name and title*

AUSA: Kevin Y. Fu (ext. 3576)

**AFFIDAVIT**

I, Steven N. Levin, being duly sworn, declare and state as follows:

## I. INTRODUCTION

1. I am a Special Agent ("SA") with the Drug Enforcement Administration ("DEA"), and have been so employed since March 2020. I am currently assigned to the Los Angeles Field Division ("LAFD"), Orange County District Office ("OCDO"), in Santa Ana, California, and my responsibilities include investigating large-scale drug trafficking organizations operating in the Southern California area and elsewhere. During the course of my employment, I have received approximately 300 hours of specialized training at the DEA Academy in Quantico, Virginia, on drug identification, detection, and interdiction, money laundering techniques, conspiracy investigations, and asset identification, seizure, and forfeiture.

2. I have participated in investigations that involve one or all of the following crimes: possession, distribution, possession with intent to distribute, and manufacture of controlled substances. Based on my training and experience, my conversations with other law enforcement personnel, and my own participation in this investigation, I am also aware of the tactics and methods employed by individuals involved in drug trafficking organizations to avoid detection by law enforcement, including the use of: multiple wireless telephones, pre-paid cellular telephones, cloned communication devices, debit calling cards, public pay telephones, counter-surveillance techniques,

false or fictitious identities, coded and ambiguous language in conversations, multiple vehicles, and vehicles with concealed compartments. I am aware that drug traffickers drop or switch telephones and/or telephone numbers frequently to thwart law enforcement investigation of their criminal activities. I am further aware that drug traffickers use wireless telephones subscribed in the names of other individuals, oftentimes their spouses or other family members, to avoid law enforcement detection. Based on my training and experience, I have found that it is common for narcotics traffickers to obtain, maintain, and use firearms in order to protect their narcotics and narcotics proceeds, and that the cellphones they use have high call volume from a variety of telephone numbers.

3. I have executed numerous search warrants to seize evidence of violations of federal and state law, as well as arrest warrants to apprehend individuals who have committed such violations. Additionally, I have led and participated in numerous investigations and operations to detect and combat the importation, trafficking, distribution, and sales of drugs.

## II. **PURPOSE OF AFFIDAVIT**

4. This affidavit is made in support of a criminal complaint against and arrest warrants for Mario AYALA-OCAMPO[1] and Hector MECINA ("MECINA") for a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii): Distribution of At Least 50 Grams of Methamphetamine, a Schedule II Controlled Substance.

---

[1] AYALA-OCAMPO is also the victim in a kidnapping case being investigated by the Costa Mesa Police Department.

5. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information, documents, or other materials obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III. SUMMARY OF PROBABLE CAUSE

6. Based on my training and experience, investigation in this case, review of investigation reports, and debriefings with law enforcement officers, I am aware that on April 9, 2020, and March 31, 2021, Mario AYALA-OCAMPO and Hector MECINA, working together, on April 9, 2020, sold, to an undercover officer ("UC") with the Costa Mesa Police Department, approximately 418 grams methamphetamine and on March 31, 2021, approximately 436 grams of methamphetamine. I am also aware of the following: on March 5, 2020, AYALA-OCAMPO and another individual sold the UC approximately 55.7 grams of methamphetamine; on March 12, 2020, AYALA-OCAMPO and another individual sold the UC approximately 53.5 grams of methamphetamine; and on April 13, 2020, AYALA-OCAMPO sold the UC approximately 53 grams of methamphetamine.

## IV. STATEMENT OF PROBABLE CAUSE

7. I have reviewed the police reports prepared by Costa Mesa Police Department ("CMPD") detectives, as well as reports regarding drug weight and purity from the DEA Southwest Laboratory, translated transcripts of Spanish-language recordings, as well as other materials. Based on my review of the above-mentioned materials and conversations with detectives, I have learned the following facts:

### A. March 5, 2020 Sale by AYALA-OCAMPO

8. On March 5, 2020, a CMPD officer acting in an undercover capacity (the "UC") and a third person met with E.M.[2] for the purpose of purchasing two ounces of methamphetamine for $280.00 ($140 per ounce). The meeting took place at the Golden Dragon Restaurant, located at 2023 Harbor Blvd, Costa Mesa, CA. When E.M. arrived, he informed the UC that the person who actually had the methamphetamine was on the way to the location. After several minutes, a black 1998 Mercedes sedan arrived, driven by a male later identified as Mario AYALA-OCAMPO. AYALA-OCAMPO was the sole occupant of the vehicle. At that time, the UC handed $280.00 to E.M., who then walked toward AYALA-OCAMPO, who was still in the black Mercedes. AYALA-OCAMPO handed E.M. two clear plastic baggies containing a white substance, and E.M. handed AYALA-OCAMPO the $280.00. E.M. then returned to the UC and handed the baggies to the UC, who recognized the white crystalline substance within to be consistent with methamphetamine, based on the UC's training and experience. The

---

[2] E.M. is deceased.

UC then used a portable digital scale to weigh the bags. After weighing both bags, the UC informed E.M. that they did not contain the full weight of methamphetamine that was previously agreed upon. E.M. then walked back to AYALA-OCAMPO and had a brief conversation, after which AYALA-OCAMPO handed E.M. another small baggie. E.M. then walked back to the UC and handed the baggie to the UC. The UC again recognized the substance inside the baggie to be suspected methamphetamine. E.M. then walked back toward AYALA-OCAMPO, at which time the UC and the third individual left the location. Surveillance units from the CMPD Special Investigation Unit ("SIU") then followed AYALA-OCAMPO back to 2203 Pomona Ave, Costa Mesa, CA. The UC returned to CMPD and booked the suspected methamphetamine as evidence. The suspected methamphetamine was later tested by the DEA Southwest Laboratory and determined to be approximately 55.7 grams of actual methamphetamine.

  **B. March 12, 2020 Sale by AYALA-OCAMPO**

  9. On March 12, 2020, the UC texted E.M. requesting to buy two ounces of methamphetamine, to which E.M. agreed. Shortly after 3:00 pm, the UC arrived at the aforementioned Golden Dragon Restaurant, parked, and sent E.M. a text saying the UC had arrived. E.M. arrived a short time later, walked up to the UC's vehicle, opened the front passenger door, and sat down. He brought out a glass methamphetamine pipe and began to smoke methamphetamine. Shortly thereafter, AYALA-OCAMPO arrived in a

black Nissan sedan bearing California license plate 7DZBO23,[3] and parked next to the UC's vehicle. AYALA-OCAMPO was the sole occupant of the vehicle. AYALA-OCAMPO exited his vehicle and walked to the rear passenger door of the UC vehicle, opened the door, and sat down. The UC introduced himself to AYALA-OCAMPO, and AYALA-OCAMPO introduced himself as "Mario." AYALA-OCAMPO told the UC that the price of methamphetamine had gone up, and that an ounce would now cost $160. The UC inquired about the price for a half pound of methamphetamine, to which AYALA-OCAMPO replied he could sell a half pound for $800.00, and said he had a half pound in his vehicle. The UC said he would make some calls and get back in touch about the half pound at a later date. AYALA-OCAMPO then handed the UC two plastic bindles containing suspected methamphetamine, which the UC weighed using a digital scale. The UC then handed AYALA-OCAMPO $320.00 and told AYALA-OCAMPO that he would buy larger quantities of methamphetamine in the future if AYALA-OCAMPO would give him better prices. AYALA-OCAMPO agreed, and gave the UC a phone number of 949-763-9811[4] to contact him with in order to arrange future drug deals. AYALA-OCAMPO then exited the UC vehicle and walked to his vehicle. The UC paid E.M. a broker's fee of $50.00 for introducing him to AYALA-OCAMPO. The UC then left the location and booked the suspected methamphetamine as evidence.

---

[3] A California DMV records check indicated that the vehicle was registered to G.O. at 2203 Pomona Ave #C, Costa Mesa, CA.

[4] Review of phone records revealed that 949-763-9811 was subscribed to M.A. (believed to be AYALA-OCAMPO's mother) at 2203 Pomona Ave, Costa Mesa, CA 92627.

The methamphetamine was later tested by the DEA Southwest Laboratory and determined to be approximately 53.5 grams of actual methamphetamine.

      **C.**    **April 9, 2020 Sale by AYALA-OCAMPO and MECINA**

      10.  On March 26, 2020, the UC sent AYALA-OCAMPO a text message asking him to call the UC. When AYALA-OCAMPO called, the UC asked about the price of one pound of methamphetamine. AYALA-OCAMPO told the UC that the price for a pound was $1,600. The UC asked AYALA-OCAMPO if he would be willing to sell the pound for $1,500, to which AYALA-OCAMPO agreed. The UC indicated that he would call when he was ready to purchase the pound of methamphetamine.

      11.  On April 7, 2020, the UC called AYALA-OCAMPO in hopes of purchasing methamphetamine, but AYALA-OCAMPO did not answer the phone. The UC subsequently texted AYALA-OCAMPO and requested that AYALA-OCAMPO call him back. On April 8, 2020, at approximately 4:19 pm, AYALA-OCAMPO texted the UC saying, "Hey." The UC then called AYALA-OCAMPO, who inquired if the UC would like to buy a half or full pound of methamphetamine. The UC told AYALA-OCAMPO that he had $2,000 to spend, to which AYALA-OCAMPO responded that he could provide a full pound and 100 additional grams at that price. The two then agreed to meet the following day.

      12.  On April 9, 2020, the UC again spoke with AYALA-OCAMPO on the phone and indicated that he wanted to buy the amount of methamphetamine they had previously discussed. At that time, AYALA-OCAMPO said that the price of methamphetamine had gone up,

and that he could only sell one pound for the $2,000.00. The UC indicated to AYALA-OCAMPO that the price was too high, to which AYALA-OCAMPO replied that he could supply the pound and three additional ounces for $2,000. The UC agreed, and the two agreed to meet later that day.

13. On the same day, at approximately 1:57 pm, the UC called AYALA-OCAMPO, but got no response. The UC texted AYALA-OCAMPO asking when they could meet. AYALA-OCAMPO replied that he could meet in about thirty minutes.

14. At approximately 2:42 pm, the UC called AYALA-OCAMPO and asked if they could meet at the Home Depot in Costa Mesa. AYALA-OCAMPO said that police officers frequently want to meet at Home Depot stores, and asked the UC to remind him how they knew each other. The UC stated that he was not a police officer and reminded him that AYALA-OCAMPO had sold to the UC on two prior occasions. AYALA-OCAMPO said he remembered and agreed to meet the UC later.

15. At approximately 4:20 pm, the UC texted AYALA-OCAMPO to ask if they could still meet. AYALA-OCAMPO stated that he would send the address where he wanted to meet. AYALA-OCAMPO later sent a message asking to meet at the Harbor Bay Motel, located at 2026 Harbor Blvd, Costa Mesa, CA. The UC agreed to meet there.

16. As the UC was driving to the agreed upon location, AYALA-OCAMPO called him, asked for his location, and told him to stay on the phone while he directed him to another location.

AYALA-OCAMPO directed the UC to Rea Elementary School, located at 661 Hamilton Street, Costa Mesa, CA.

17. At approximately 5:00 pm, the UC arrived at Rea Elementary School. Upon entering the parking lot on the east side of the school, the UC saw AYALA-OCAMPO near the driver's side door of a white 2005 Nissan truck bearing California license plate 7U57848, and speaking with the driver of the truck.[5] The UC parked next to the truck and rolled the window down. AYALA-OCAMPO then came to the passenger door of the UC vehicle and asked if the UC had the money, to which the UC responded that he did, and proceeded to count the money in front of AYALA-OCAMPO.

18. The UC said he wanted to see the methamphetamine prior to handing over the money. After some discussion, AYALA-OCAMPO walked back to the aforementioned truck and looked around inside. The UC observed the driver of the vehicle, later identified as Hector MECINA by his vehicle registration and DMV photograph, also reaching toward the front passenger seat. Several minutes later, AYALA-OCAMPO returned to the UC, stood at the front passenger side window, and informed the UC that MECINA had forgotten the methamphetamine. The UC stated that he thought AYALA-OCAMPO and MECINA might be trying to rob him, to which AYALA-OCAMPO replied that they were not, and that he was simply nervous about selling the methamphetamine because they saw an unidentified male drive by earlier and look at them. The UC

---

[5] A California DMV records check indicated that the vehicle was registered to Hector Alfonso MECINAPALOMO (believed to be Hector MECINA) at 2519 Kincaid Dr, Apt 101 Costa Mesa, CA.

expressed frustration about driving out to meet AYALA-OCAMPO and not being able to purchase anything. AYALA-OCAMPO said he would call MECINA back about obtaining methamphetamine. AYALA-OCAMPO then made a brief phone call and told the person on the other end of the line to come back to the location. AYALA-OCAMPO then opened the passenger door of the UC vehicle and waited inside for MECINA to return.

19. Several minutes later, MECINA approached the UC vehicle on foot. MECINA opened the front passenger door and removed a clear plastic bag from his sweater, which contained a white crystalline substance that the UC recognized to be consistent with methamphetamine from his training and experience. MECINA said the bag had one pound, and that the price would be $1,500 for the pound, to which AYALA-OCAMPO added that he would obtain the additional three ounces discussed and give them to the UC later. MECINA then handed the bag to AYALA-OCAMPO. AYALA-OCAMPO placed the bag near the center console of the vehicle, and the UC gave MECINA $1,500. Upon receiving the money, MECINA walked away from the vehicle.

20. AYALA-OCAMPO remained in the vehicle and requested that the UC give him $500.00, to which the UC replied that he could not pay $2,000.00 for one pound of methamphetamine, but that they had agreed upon one pound and three ounces at that price. The UC gave AYALA-OCAMPO $100.00. MECINA then returned and asked if everything was all right. The UC and AYALA-OCAMPO replied that it was, and MECINA left again. AYALA-OCAMPO asked for $200.00 total and insisted that he would call the UC when he

had the additional ounces. The UC gave AYALA-OCAMPO the money, and AYALA-OCAMPO walked away.

21. The UC returned to CMPD and processed the suspected methamphetamine as evidence. The DEA Southwest Laboratory later tested the methamphetamine and determined it to be approximately 418 grams of actual methamphetamine.

### D.  April 13, 2020 Sale by AYALA-OCAMPO

22. On April 12, 2020, the UC contacted AYALA-OCAMPO and stated that he needed two ounces of methamphetamine. AYALA-OCAMPO stated that the price for two ounces would be $300. The UC agreed and said he could meet the following day. AYALA-OCAMPO later texted the UC and said the price for the two ounces had gone up to $350. The UC said he could not pay that, and proposed a price of $320, to which AYALA-OCAMPO agreed.

23. On April 13, 2020, the UC and AYALA-OCAMPO agreed to meet at the aforementioned Rea Elementary School. At approximately 3:55 pm, the UC arrived at the location and texted AYALA-OCAMPO to let him know. AYALA-OCAMPO replied that he was on his way, and arrived shortly thereafter in the black 1998 Mercedes AYALA-OCAMPO was previously seen in, and parked next to the UC vehicle. AYALA-OCAMPO signaled for the UC to come to the Mercedes. The UC walked to the driver's side window of the Mercedes, noticed that AYALA-OCAMPO was the sole occupant, and handed him $320.00 through the driver's side window. AYALA-OCAMPO then reached inside his front right pocket and removed two small clear baggies containing a white crystalline substance that the UC recognized as being consistent with methamphetamine,

based on his training and experience. The UC then used a digital scale in the UC vehicle to weigh the baggies, confirmed that they were each approximately an ounce, and left the parking lot. The UC then returned to CMPD, where he booked the suspected methamphetamine as evidence. The methamphetamine was later tested by the DEA Southwest Laboratory and determined to be approximately 53 grams of actual methamphetamine.

  **E.** **March 31, 2021 Sale by AYALA-OCAMPO and MECINA**

  24. On March 31, 2021, at approximately 11:44 am, the UC called AYALA-OCAMPO and requested to buy one pound of methamphetamine from him. AYALA-OCAMPO said he would call the UC back shortly if he could obtain the requested pound. At approximately 11:53 am, AYALA-OCAMPO called the UC and said that MECINA would meet him at 5:00 pm at Rea Elementary School, located at 661 Hamilton St, Costa Mesa, CA. AYALA-OCAMPO also indicated that the price for one pound of methamphetamine would be $1,900.00. The UC agreed to meet.

  25. On the same day, at approximately 5:00 pm, the UC arrived at Rea Elementary School and parked his vehicle in the parking lot. Shortly after the UC arrived, MECINA arrived in a black Infinity bearing California license plate 7NCA096. MECINA exited his vehicle and walked towards the UC vehicle, and got inside. Inside the vehicle, MECINA handed the UC a clear Ziploc bag containing a white crystalline substance which the UC recognized to be methamphetamine based on his training and experience. The UC then removed money from his pocket and began handing the money to MECINA. As the UC was counting the money,

MECINA said he would give the UC his phone number so that the UC could go directly to him for future purchases, and that he could drop the price if the UC would buy directly from him. The UC began handing the money to MECINA, but before the full $1,900.00 was handed over, CMPD SIU and CMPD Gang Investigators arrived and arrested MECINA. MECINA was transported to the CMPD jail for booking. During the booking process, MECINA stated that his current address was 550 Paularino Ave #K104, Costa Mesa, CA.

26. The UC seized MECINA's cellphone, which was locked. On the lock screen, there was a message from AYALA-OCAMPO on the "Messenger" app, asking in Spanish, "Is it complete," in reference to the drug deal. AYALA-OCAMPO later messaged MECINA saying, "Send me the money when you can please," in reference to the money MECINA was going to pay AYALA-OCAMPO for brokering the deal.

27. On the same day, at approximately 9:23 pm, CMPD SIU Detective Vijay Chawla obtained a state search warrant for the residence at 550 Paularino Ave K104, Costa Mesa, CA, to search for evidence related to narcotics sales, firearms and firearms related items, US currency, and dominion and control. Shortly thereafter, CMPD SIU executed the search warrant at the above-mentioned residence. Among the items seized and booked as evidence by CMPD were a photocopy of MECINA's Mexican passport, a digital scale, $50 in US dollar coins, and $27,753.00 in US currency.

28. The suspected methamphetamine obtained from MECINA on March 31, 2021, was tested by the DEA Southwest Laboratory and

determined to be approximately 436 grams of actual methamphetamine.

## V. CONCLUSION

29. For all the reasons described above, there is probable cause to believe that Mario AYALA-OCAMPO and Hector MECINA violated 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii): Distribution of At Least 50 Grams of Methamphetamine, a Schedule II Controlled Substance.

/s/ Steven N. Levin
Steven N. Levin, Special Agent
Drug Enforcement
Administration

Subscribed to and sworn before me this 29th day of January, 2024.

_____
HONORABLE JOHN D. EARLY
UNITED STATES MAGISTRATE JUDGE